UNITED STATES of America, Appellee,

v.

**Richard A. CARROLL,
Defendant, Appellant.**

No. 88–1028.

United States Court of Appeals,
First Circuit.

Argued June 7, 1988.

Decided Nov. 2, 1988.

Robert B. Mann, Providence, R.I., for defendant-appellant.

Edwin J. Gale, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief, for appellee.

Before COFFIN and BREYER, Circuit Judges, and ACOSTA,* District Judge.

ACOSTA, District Judge.

Richard A. Carroll ("appellant") appeals the District Court's denial of his motion for a new trial. He was convicted by a jury for violations of the Hobbs Act. 18 U.S.C. § 1951. We affirm the judgment.

## PROCEDURAL BACKGROUND

Appellant and codefendant Joseph DiSanto ("DiSanto") were charged with conspiracy to violate and a substantive violation of the Hobbs Act. Their first trial resulted in a jury verdict of guilty on all counts against both appellant and DiSanto, which was set aside by the trial judge who granted their motions for a new trial.

After some procedural matters which are not relevant herein were disposed of, appellant and DiSanto were re-tried.

In their second trial, appellant was once again convicted on both counts and DiSanto was acquitted of all charges. The trial judge granted appellant's motion to vacate the conspiracy conviction based on DiSanto's acquittal, but he declined to order a new trial as to the substantive count. *United States v. Carroll,* Cr. No. 85–0022(P), slip opinion (D.R.I. October 29, 1987).

Appellant claims that a third trial is warranted because the trial judge erred (1) in admitting into evidence statements attributed to his co-conspirator, (2) in admitting into evidence copies of two checks, and (3) in giving undue prominence to these checks by first admitting them, then excluding them, and finally allowing them back into evidence.

The district judge found that there was enough independent evidence to support the conviction, and did not address the possibility of error in the admission of the checks or of DiSanto's statements. He found that the main witness' testimony in the new trial was credible and that his (the witness') possible deal with the government (which gave him a reason to lie) had been disclosed to the jury which chose to believe the testimony. He was not willing to conclude that the jury acted unreasonably in believing the star witness.

A denial of a motion for a new trial[1] will only be reversed if such denial would result in a "miscarriage of justice or * * * the evidence heavily preponderates against the verdict." *United States v. Thornley,* 707 F.2d 622, 626 (1st Cir.1983). As discussed below, we hold that the court's refusal to grant the motion for a new trial was proper but on the slightly different ground that we simply find no error in the rulings regarding the coconspirator statements and the admissibility of the duplicates of two bribe checks.

## FACTUAL BACKGROUND

The government charged that appellant, who was the Chairman of the Water Sup-

---

* Of the District of Puerto Rico, sitting by designation.

1. In relevant part, Rule 33, Fed.R.Crim.P., reads as follows:

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. * * *.

ply Board of the City of Providence, Rhode Island, and DiSanto, who was the Director of the Department of Public Works, demanded and received kickbacks from the owner of a plumbing company in return for a $79,000 contract to replace a boiler at the Board's offices. The contract was awarded in 1979 and the work was completed in 1980.

The star witness for the prosecution was Robert J. Riccitelli ("Riccitelli") the owner and operator of Elaine Plumbing and Heating Company, Inc. ("Elaine").

Riccitelli testified that he started to attend local political functions in order to improve his chances of obtaining government contracts. As part of this strategy, he purchased tickets to the Sixth Ward "Republican Italian Night" fund-raising function at Caruso's Restaurant in Providence. While there, DiSanto "caught [Riccitelli's] eye and asked [him] to come over to where he [DiSanto] was standing with Mr. Carroll." DiSanto asked Riccitelli whether or not he would be interested in a "large job" for the Water Supply Board, to which he replied affirmatively. While appellant silently stood at arms-length near the bar at Caruso's, DiSanto explained the kickback scheme, which Riccitelli described at trial as follows:

> Okay. At this point, Mr. DiSanto had told me that it was a large job, and if I wanted it I could have it, and with conditions that if I accepted, that there would be a kickback on the job. It was a 15 or 20 percent for the job, I forgot, to make me low, and 50 percent for any extras, that I would have to determine what they would be. He agreed to that, and then I accepted it.

In other words: the contractor had to pay a bribe to get the contract, fifteen percent (15%) of the contract amount if he *was* the low bidder, and twenty percent (20%) if appellant and DiSanto had *to make* him the low bidder; plus fifty (50%) of the charges for the so-called "extras," i.e., work not contemplated in the original contract. Riccitelli demanded and received the right to

determine what the extras would be, and thereafter he accepted the arrangement.

Later, in a meeting at his city hall office, DiSanto told Riccitelli that a bid in the eighty to ninety thousand dollar range would probably get him the job.

During a conversation with either appellant or DiSanto,[2] Riccitelli was told that the matter of a required performance bond, which he had been unable to obtain, "would be taken care of." The contract was signed and no bond was ever demanded although it was normally required on such contracts.

Some time thereafter, Riccitelli called appellant to ask about a "progress payment," i.e., partial payment for work already completed on the contract. Riccitelli requested about $30,000 in order to pay for labor and materials costs actually incurred, but appellant told him to request more so he (appellant) could get his bribe money. A few days later, appellant called Riccitelli to ask when he (Riccitelli) would deliver the kickback money to appellant. Riccitelli advised appellant it would be delivered in a few days. Shortly thereafter, Riccitelli received a $45,000 check from the city of Providence which he deposited in Elaine's checking account. Riccitelli then obtained $11,000[3] in cash and delivered the kickback money to appellant at his place of business, a jewelry store in Providence.

Riccitelli then made up an inflated bill for extra work and submitted the pertinent invoice to the City in the amount of $18,425. Later, Riccitelli called appellant requesting payment. Some time after that, the city paid Riccitelli in full even though the architect who had done the design work for the job reviewed the invoice and told appellant that he "was being ripped off" by the contractor. Soon after he had received the money for the extras, appellant called Riccitelli to ask when the fifty percent kickback would be paid. Riccitelli again replied that he would deliver the money in a few

---

2. Riccitelli asserted that it was either appellant or DiSanto, but he was not sure which one.

3. Approximately fourteen percent (14%) of the contract amount of $79,000.

days. Several days later, Riccitelli delivered $9,212.00 in cash [4] to appellant's store.

The kickback scheme was uncovered when Riccitelli was subpoenaed by a Grand Jury investigating corruption in the Providence City government. In 1984, he testified before a Grand Jury under a grant of "use immunity." [5] Riccitelli's testimony at trial was also given under a grant of full immunity.[6]

The mishandling of Elaine's funds, the doctoring of its financial records,[7] as well as Riccitelli's tax evasion conviction became important issues at appellant's trial for the following reasons: (1) Riccitelli's testimony about pay-offs to appellant was supported by introducing copies of several checks into evidence, and (2) the defense argued that Riccitelli made-up the kickback scheme in order to cover up conversions of moneys from Elaine's account to his personal use.

Two of the checks, Exhibits 7 and 8, were prints of the microfilm records of the bank from which they were issued. There were two checks for $4,606.00 paid to "cash" for a total of $9,212.00. Riccitelli testified that these checks were used to generate the cash for appellant's kickback on the extras ($9,212.00 is approximately half of the $18,425 that the City paid for extras).

A bank custodian of records presented the prints and described them as true and accurate copies of records kept in the regular course of business, i.e., microfilm copies of all checks drawn from their customer's accounts. The checks were first admitted into evidence contingent upon their being properly identified by the person who wrote and cashed them. When Riccitelli testified that he could not say whether the signature on the checks was written by him or by Martin (since either one of them signed Elaine checks using Riccitelli's name), the judge excluded the exhibits and instructed the jury as follows:

* * * [Exhibits] 7 and 8, you were shown those two checks earlier in the day. You're shaking your head[s in the affirmative] * * *. Those checks are stricken from this record. The exhibits, as exhibits, are stricken from the record. They have proven to have no relevancy, no nexus, no connection with the testimony in this case and play no part in the evidence that you are to consider at the conclusion of this trial. Do all understand me clearly? I don't even want those checks as being discussed at anytime, because they just simply are no part of this case and have nothing to do with this case. They're stricken from the record, is that clear? Okay.

However, after further testimony and argument on the matter, the trial judge ruled that the evidence was admissible under the Federal Rules of Evidence. He first found that the checks were what they purported to be, i.e., checks drawn on Elaine's bank account, and that the jury would decide the question of how the funds obtained through those checks were used. The judge then ruled that the checks were relevant and that their probative value was not substantially outweighed by the possibility of unfair prejudice to appellant.[8] On the

---

**4.** How this cash was generated is discussed more fully below.

**5.** "Use immunity" is a "[t]erm [which] generally refers to [an] order of [a] court [or of the United States Congress] which compels a witness to give testimony of self-incriminating nature but provides that such testimony may not be used as evidence in subsequent prosecution of such witness." Black's Law Dictionary, 5th Ed. at 1383.

**6.** Riccitelli, his brother Ronald Riccitelli ("Ronald") and his brother-in-law bookkeeper Roland Martin ("Martin"), were indicted for tax evasion in 1983. Riccitelli pleaded guilty to several counts and received a 4–year sentence and paid a $4,000 fine.

Although Riccitelli denied that he made an arrangement to this effect with the government, an Assistant United States Attorney took steps to have the Internal Revenue Service refrain from seeking further sanctions against him.

**7.** It appears that the Riccitelli brothers and their brother-in-law used creative bookkeeping to evade taxes. Riccitelli allowed Martin to handle the financial records of Elaine in return for writing checks to himself when he needed money. Martin would often write checks signing Riccitelli's name, with the latter's approval.

**8.** *See* Rule 403, Fed.R.Evid. ("Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger

question of authentication of exhibits 7 and 8, the judge ruled that testimony by Riccitelli as well as by a handwriting expert would meet the requirements of Rule 901(a).[9]

Appellant's counsel then joined DiSanto's attorney in moving for a mistrial because of the purportedly prejudicial effect of the admission-exclusion-admission of these exhibits. The trial judge took the motion under advisement.

Thereafter, Martin testified that he wrote the two checks, gave one to Riccitelli, cashed the other one and gave the money to Riccitelli; but he could not identify which of the two checks he had endorsed and cashed. The judge denied the motion for a mistrial and announced to the jury that he had reversed himself on the admissibility of these exhibits by stating:

> I want to advise you that earlier in this trial I told you to disregard two checks. I don't know the numbers. I think they're 13—no, 7 and 8, I think were the numbers, am I correct, Gentlemen? Exhibits 7 and 8. Those checks are in evidence now, and are part of the evidence in the case, which together with all the evidence in the case you are to weigh in your deliberations. My rulings were based purely on legal principles and legal concepts, and when you make rulings on law, it's a developing thing as the trial goes on. The legal premise for admissibility or exclusion may change, may take on a different posture as the facts develop or as the case develops, but it has no significance as far as you are concerned. You under no circumstances must ask yourselves, well why did that ruling change, or why did the Government rule in favor—or why did the Court rule in favor of the Government, or why did the Court rule in favor of the defendant. That's why I've told you so many times that I excuse you from the courtroom when we have legal arguments for fear that the legal arguments which we have, and which are in most instances freewheeling arguments, could possibly affect your thinking. But for those legal arguments that do take place in your presence, and those legal arguments as a result of which you have become aware of [sic], nevertheless, must be disregarded by you. They're of no significance at all and no invasion of your province, because of rulings of law that I make. Do you understand? It does not in any way emphasize that evidence, it does not in any way diminish that evidence. As far as you're concerned, it's the evidence, period, and you don't weigh what I did in deciding the significance of that evidence and the weight that you will give to that evidence when you commence your deliberations. Does anyone have any problems with that? No? Okay. * * *.

Following this instruction, Riccitelli was again called to testify and he identified the two exhibits as the checks used to generate the fifty-percent kickback. On cross-examination he admitted that he could not tell who had endorsed and cashed the checks, but added that it must have been either him or Martin.

After further testimony, the case was given to the jury which, following three hours and forty minutes of deliberations, returned verdicts of guilty on both counts against appellant, and not guilty on both counts as to DiSanto.

## THE COCONSPIRATOR STATEMENTS

Appellant argues that because the conspiracy count would not be available in retrial the government would not be able to introduce the statements attributed to alleged coconspirator DiSanto, and their admission during the first trial was thus erro-

---

of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waster of time, or needless presentation of cumulative evidence.") (Emphasis added.).

**9.** Rule 901(a), Fed.R.Evid. ("The requirement of authentication or identification as a condi-

tion precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

This evidence was apparently never presented.

neous. This argument misconstrues the test for admission of coconspirator statements under the applicable hearsay rule.[10]

■ Before allowing such statements into evidence, the trial court must rule that a preponderance of the evidence before it supports a finding that a conspiracy existed at the time the statement was made and that the statement was in furtherance of the conspiracy. *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977); *see also United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.) *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980) (trial judge must consider evidence presented by both prosecution and defense when making *Petrozziello* finding). The statement itself may be considered when making this finding, *see Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2780–2790, 97 L.Ed.2d 144 (1987), but other independent evidence of a conspiracy may be required, *see United States v. Dworken*, 855 F.2d 12, 23–26 (1st Cir.1988). Lastly, the conspiracy in which a challenged statement is made need not even be charged in the indictment. *United States v. Munson*, 819 F.2d 337, 343 (1st Cir.1987).[11]

■ Upon review of the record, we find that the trial judge's finding that DiSanto's statements met this test are well supported by the record and was a proper exercise of his discretion. Appellant submits, however, that DiSanto's acquittal *retroactively* invalidates the trial judge's ruling that the statements were admissible. We disagree.

Provided that the trial court properly exercised its discretion and applied the correct test for admissibility of such statements, "the admission of testimony under the co-conspirator exception to the hearsay rule is not rendered retroactively improper by subsequent acquittal of the alleged co-conspirator." *United States v. Cravero*, 545 F.2d 406, 419 (5th Cir.), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1976); *accord United States v. Robinson*, 651 F.2d 1188, 1196 (6th Cir.1981); *United States v. Gil*, 604 F.2d 546 (7th Cir.1979). As discussed above, the trial court applied the correct test and its finding is supported by the record. Because DiSanto's acquittal does not invalidate the district court's finding, appellant is not entitled to a new trial. *See United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983) (appellant's motion for a new trial was properly denied by the District Court because admission of acquitted codefendant's statements did not constitute error).

### THE CHECKS

Appellant argues that the so-called "best evidence rule"[12] requires that the original checks or at least the original microfilm should have been admitted because of the possibility of alteration by Riccitelli or his employees and, alternatively, that the checks were unfairly highlighted because of the roundabout way in which they were finally allowed into evidence. We disagree on both counts.

The originals[13] of these checks were returned to Elaine and were not available for use at trial.[14] Nonetheless, copies of the checks generated from microfilm records kept by the bank were produced.

"To prove the content of a writing * * * the original writing * * * is required, except as otherwise provided in [the Federal Rules of Evidence]." Rule 1002, Fed.R. Evid. However, "[a] duplicate is admissi-

---

10. In relevant par, Rule 801, Fed.R.Evid., states:
    **(2) Admission by a party-opponent.** * * *
    (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

11. Appellant incorrectly argued otherwise. *See* Appellant's Brief at p. 16.

12. Codified in Article X of the Federal Rules of Evidence: Rules 1001 through 1008.

13. Rule 1001(3), Fed.R.Evid., defines "[a]n 'original' of a writing or recording [as] the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it." Therefore, the originals of the checks used by Riccitelli and Martin to generate the cash amount of the bribe are the checks themselves.

14. Appellant's counsel tried to establish that they were unavailable because Riccitelli and Martin had destroyed records in order to protect themselves from the tax evasion charges.

ble to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Rule 1003, Fed.R.Evid.

■ The Federal Rules of Evidence define a "duplicate" as follows:

A 'duplicate' is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original.

Rule 1001(4). Under the facts of this case, the microfilm copy of a check is a "duplicate" as defined by this rule.[15] Additionally, the fact that what was actually admitted into evidence was technically a duplicate of a duplicate, i.e., a print made from the microfilm does not affect our analysis. In a pre-rules case in which the evidence had been admitted pursuant to the Federal Business Records Act, 28 U.S.C. § 1732, a Circuit Court held that "when satisfactorily identified[,] the microfilm and reproduction therefrom become equally competent as the original check[,]" and their introduction into evidence did not violate the common law Best Evidence Rule. *Williams v. United States,* 404 F.2d 1372, 1373 (5th Cir.1968), *cert. denied,* 394 U.S. 992, 89 S.Ct. 1482, 22 L.Ed.2d 768 (1969). We think that this rule is the proper one under the new rules of evidence. Consequently, we hold that when a print of a microfilm copy of bank checks, kept by the bank in the regular course of business, is properly identified by a custodian of records as a complete and accurate reproduction thereof —as were the materials here when the bank custodian of records authenticated them—such prints are "duplicates" under the Federal Rules of Evidence and the microfilm itself need not be produced.

■ The remaining issue is whether these duplicates may be admitted in lieu of the missing original checks, which requires us to study the possibility of alteration of the original or of the unfairness of admitting the duplicates. We find that admission of these duplicates is not barred by either exception to Rule 1003.

While Martin acknowledged that he altered checks and check stubs *after* he received the cancelled checks from the bank, and the alteration of Elaine's financial records was fully explored before the judge and the jury, there is no evidence that there was any alteration *before* the checks got to the bank. Nor did appellant argue that there was any alteration at the bank level. Thus, the authenticated print of the microfilm *provided by the bank* is just as good as the check itself under the facts of this case.[16]

■ The checks also pass the last hurdle of the Best Evidence Rule. In relevant part, Rule 1004 states:

The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if—

(1) * * * [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;

The record reflects that the originals were either lost or destroyed by Riccitelli or Martin, and there are strong suggestions that this was done in bad faith (i.e., in order to hamper the tax-evasion investigation). However, the proponent of the evidence, i.e., the government, had nothing to do with their disappearance and repeatedly requested the original checks through subpoenas

---

**15.** The Notes of the Advisory Committee on the Proposed Rules indicate that

a bank's microfilm record of checks cleared is the original as a record. However, a *print* [of the microfilm] offered as a copy of a check whose contents are in controversy is a duplicate. This result is substantially consistent with 28 U.S.C. § 1732(b) [The Federal Business Records Act].

(Emphasis added.)

**16.** In fact, under the circumstances of this case, the bank's records would appear to be the most reliable source for the checks given the self-serving handling of Elaine's financial records by Riccitelli and Martin.

duces tecum. Thus we find that admission of the legitimate duplicates of the checks was permissible because the originals were either lost or destroyed through no fault of the proponent.

We would also note that these microfilm prints are precisely what their proponent claims they are: authenticated copies of the checks actually used to obtain $9,212 in cash from Elaine's account with the bank. Thus, the microfilm would alternatively be admissible as the record of the cash transaction from Elaine's account with the bank.[17] Whether or not the money was actually used to bribe appellant was a question of fact properly decided by the jury. The admissibility of the exhibits into evidence is a separate matter and the judge's ruling on it was appropriate.

■ Lastly, we do not find that the exhibits received unfair prominence because of the way in which they were admitted. During his opening instructions, the trial judge carefully advised the jury that he would decide all issues of law, including evidentiary problems. When the exhibits were removed from the record, he again told the jury that he had merely made a ruling on their admission and gave a curative instruction. Finally, when the items were re-admitted the judge gave a carefully worded instruction explaining the situation. Jurors are assumed to follow the instructions of the court, *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987), and we hold that in the context of this long trial the treatment of these exhibits was not unfairly prejudicial to appellant.

## CONCLUSION

Finding no error in the denial of appellant's motion for a new trial, the decision of the district court is AFFIRMED.